Good morning. May it please the Court, I'm Tom Moore. I represent the Appellants and Defendants JSL Corporation. Your Honor, may I reserve five minutes for a couple of questions. Sure, just keep track of your time. We've been a little generous this morning. I've recognized that. I'll keep track. This appeal arises out of a trademark dilution dispute over a coined word, e-visa. On the one hand, you have Visa International, who has sought to enjoin the use of that word on the basis of the fame of its regular trademark, visa, for credit cards. On the other hand, there's my client, JSL, who coined the word e-visa, using the word visa, that portion, in its English language sense and with its English language association with international travel and the like. So this case raises the issues surrounding the Federal Trademark Dilution Act. It also brings to the fore how that act should be applied when a famous mark is also an English word. We contend that an English word famous mark has a kind of built-in blurring, that it not only has an association with a particular set of goods and services, but it also has an association with an English meaning, and that in order for a famous mark to establish actionable dilution, it has to overcome the association with the ordinary English word. Let me ask you a question. Yes, Your Honor. This is kind of bothering me. At the time the district court judge entered the granted summary judgment and entered the injunction and then modified the injunction, the Supreme Court had not yet decided Mosley v. I guess it was Victoria's Secret. Yes, V. Secret Catalog. That's exactly right, Your Honor. Now that we have the Supreme Court's teachings about the Federal Dilution Act, does that make a difference here in what the district court did? Yes, absolutely, Your Honor. In what way? And what should we do about that? What it means is that the district court applied the wrong substantive law. The district court applied a likelihood of dilution standard. If you review his analysis, it only goes as deeply as to determine that the words visa and e-visa are similar, as indeed they are similar. What the Supreme Court held is that a likelihood of dilution is not the applicable standard. Actual dilution is the standard. So at the very least, because the district court used the wrong substantive law, this case needs to be reversed. The wrong standard. That's correct. Now, do we know that for sure? Yes, we do, Your Honor. Yes, we do, Your Honor. And let me ask you this. What evidence do they need to show actual dilution? What evidence will visa need to show actual dilution? They need to show something other than a perception by people that these two marks are viewed in a distinct fashion. Are viewed as what? I'm sorry? That these two marks, that is, the famous mark visa and the junior mark e-visa, are viewed in a distinct fashion. If somebody looking at the e-visa mark has no different impression, to use Justice Stevens' term from the Mosley case, about the senior mark, about the famous mark visa, then there is no actual dilution. I must say that I find the Mosley case mysterious as to what it is. I'm sorry. Just that I find the case mysterious as to what it actually on the ground expects these trials to look like. Do you have any sense of what evidence, for example, a visa would be required, in your view, to present to meet the standard under Mosley? Yes, I agree that Mosley is a bit of an enigma. The clues are there. In the first place, the court says that an owner or holder of a famous mark like visa need not show lost profits, lost sales, anything of that nature. On the other hand, mental association between the two marks is in itself insufficient. At least if they're not identical. That's correct. Whatever that means. At least if they're not identical. Justice Stevens goes on to say if they are identical, that may be circumstantial evidence of dilution. That's exactly right, Your Honor. Are these marks identical? They are not identical, Your Honor. And that is a separate answer. Returning to Judge Berzon just for the moment, then I'll return to whether they're identical. What Justice Stevens notes in the case of Victoria's Secret and Victor's Little Secret, what he noted was that the Army officer in question, the Army officer who essentially ratted out Victor's Little Secret to Victoria's Secret, he noted that the Army officer did not have any different impression of Victoria's Secret as a result of seeing the junior mark Victor's Little Secret. So what Visa would have to do, particularly in the form of market survey evidence or the like, is show people, you know, this is Visa. This is what it does credit cards. This is e-Visa. This is the website related to international travel. Do you think any differently? Do you have a different impression of Visa, the famous mark, as a result of the junior mark? Confusion is not enough? Yes. But that's not confusion necessarily. Confusion is enough, right, to show actual dilution? Somebody who thought he was going to. Yes. Confusion would be enough. Then why isn't the fact that your client admitted he was getting e-mails, or at least one e-mail, at his site that was clearly intended for Visa International Visa to be sufficient evidence of actual dilution? That e-mail came from a Visa International employee who was e-mailing E-Visa and dropped the dash. I mean, that is not evidence of actual dilution. What we know from the record on SCR 96 is that the junior mark received an e-mail intended for the senior mark, which indicates to me at least one instance of, quote, actual dilution. I don't know that actual adds anything to the word dilution, but let's say it does. Isn't that enough? Even if the wrong standard was used, if there was actual dilution, isn't that enough? One instance of a waylaid e-mail would not in and of itself. I mean, it was sent by the person thinking he was going to go to big time Visa, and it ended up on junior mark Visa. Isn't that actual dilution? That's confusion. I thought you said that confusion was enough. Maybe you want to take that back. I thought confusion was not an element here. Confusion is an element of trademark infringement, but we're not talking about trademark infringement. It is true that a claim for actual dilution can be established without confusion. If there is confusion, it can still be actual dilution. So, you know, just in order to be clear on both of those. Well, let me ask you this. Would it be prudent, now that the parties know what the correct standard is, to return to the district court so that both parties can attempt to meet or address the standard that we know is to be applied after Mosley? Yes, that's exactly right, Your Honor. It would be prudent for this case to be reversed and remanded. And I would add that some guidance would be appropriate in this circumstance precisely because Visa is an English word. And going back to my answer to Judge Berzon's question, you know, what needs to be shown, Visa has an additional hurdle here, as I indicated before, and that hurdle has to do with this built-in blurring again. In other words, the association that the Visa portion of the e-Visa mark is going to have to an average consumer is more likely to be the association with the English word than it is an association to Visa, the credit card. Now, Your Honor, Judge Paez, you asked, isn't it so that the two marks are identical? I mean, the answer to that is Visa and e-Visa are not identical, that individual letters, little letters, can make a big difference in meaning. For example, in the Ringling Brothers case, which is cited extensively in the Mosley case, it was greatest show on earth versus greatest snow on earth. I mean, in this instance, in the domain name, Visa was used because that's the way a domain name works, without a capital V. Yes. But on the actual website, they did use it with a capital V. For my client's website? Yes. They did over a period of time, but at the time that the permanent injunction was entered, it was all lowercase. And the only difference between the websites was e-Visa and e-Visa.com, right? That's correct. The e-Visa.com belongs to Visa International and was put together and created second. It was after. That came after. It was the one that was second in time. It was the one that was second in time. Now, what do we do with the affidavit? I guess it's Simone's? Simonson. Simonson. Yes, Dr. Simonson. How does Dr. Simonson's affidavit fit into this? Well, first, the assignment that he was given was to determine whether there's a likelihood of dilution. He makes that very clear in the course of his expert report. The other thing is that he does say that there is blurring, but the basis for his expert opinion, if you will, is strictly a function of the mental association that he saw between Visa and e-Visa. It was mental association alone. So it does not stand up to the. It did strike me as a very un-expert, expert opinion. Well, you know, I'm from Palo Alto myself. I should be careful. He could be at the next dinner table. But it's not so much a non-expert as it is lacking in any kind of empirical basis for the key determination of how consumers are going to react to the two words. That is true. The other aspect of this is that somehow the rules are different on the Internet. And Visa has taken the position that there are two cases that establish that. One is the Panavision case, which came down from the Ninth Circuit. The other one is Pinehurst v. WIC, which came out of District Court in South Carolina. Both of those cases are different in this respect. Those are both cyber-squatter cases. There was a particular person who was in the business, if you will, of getting a jump start on actual Trademark.com websites. In the Panavision case, it was Panavision.com. In the Pinehurst case, it was PinehurstResorts.com. That is not the situation here. Visa already has Visa.com. Visa not only has Visa.com, but Visa also has eight or ten other websites denominated Visa Destinations, Visa Bucks, Visa Business, et cetera. There's nothing about those cases, and there's nothing about the Federal Trademark Dilution Act, which would indicate that the owner of a famous mark gets a monopoly on the Internet over letters such as VISA. Okay. I would also like to direct the Court's attention to a case that I did submit via letter brief one week ago. That's the Kellogg v. Toucan golf case. In terms of what's required to prove actual dilution, in that case, Kellogg had submitted survey reports indicating exactly how famous its mark, Toucan Sam, was. However, the Sixth Circuit in that case determined that Toucan Sam First does not remove any form of toucan from being a trademark, and it also rejected the survey evidence, which indicated nothing further than that Toucan Sam was famous and not dilution, no dilution. If you were to be back, if you were back in district court, what evidence would you offer to show that this is not dilution? I know that may not be your burden, but I'm just curious. Or would you offer any? Oh, I think I would, Your Honor. I would offer. They have the burden to prove. Yes, I know. But by way of defense, I would show first that the intent was not to write the coattails of VISA International. From the very beginning, the association was with travel. I would show what the website does in terms of its- Different area. Yes, exactly. If I were in a position to afford a study, I would conduct the study. You might as well approach it directly. I would also present evidence of these E-cases that they put forward. There are a great many domain names, which is sort of E, but then there's a generic, you know, E-toys, E-trade, E-loans. And so it's equally-there's even an E-passport.com, which I discovered yesterday, that consumers would understand E-VISA as more likely to be associated with visas, the word, you know, the passport. Are there any other active E-VISA domain names on the Web today? I'm sorry? Any other E-VISA-are there any other uses of E-VISA on the Internet? Well, I mean, we own the domain name E-VISA, and E-VISA has the other E-VISA. I don't know of any other E-VISA names. There are, I understand, other websites dedicated to visa applications a lot that do use VISA, and I believe that they are out there. Okay. Okay, if I may- Yes. I'll leave the rest for rebuttal. Thank you. May it please the Court, Michael McHugh on behalf of VISA International Service Association. Your Honors, the sole issue before the Court is whether VISA has submitted sufficient proof of actual dilution to make its prima facie case, because JSL has not provided any evidence negating actual dilution. In light of Moseley, I believe that- Why is that? I mean, they did present a fair amount of evidence about the area in which they operate and the nature of their websites and so on. That's irrelevant to the issue of whether there's actual dilution or not, and whether the parties' services are similar or not is not a factor in determining whether there's dilution. That certainly might be relevant. I'm not sure how it would be relevant, and I'm not aware of any case- The closer in it is, the more likely it is that somebody-that's just a circumstantial evidence. The farther away the product lines are, the less likely it is that anybody is going to make the association. I think the farther away the product lines are, the less likely there will be confusion, but I think the Federal Trademark Dilution Act is very clear that- Well, I understand that, but it's still less likely, and I think Nabisco and other cases say that, that the farther away the product line is, the less likely the association is going to be withdrawn. I'm not aware that the 9th Circuit has adopted that position. I know the 2nd Circuit has. I thought we wrote that in vain, actually, but go ahead. I wrote it in vain. We also said we should look-that one can look to the factors identified in Nabisco. And in this case, JSL initially did have on its website that it provides payment services, including credit card processing, which it promptly took off its website after we filed this lawsuit. Well, why does that matter? Because this is an injunctive action, right? So we need to look at what the website was at the time it was enjoined, don't we? Well, I think it is somewhat relevant because I think we see a pattern of JSL's conduct that it sort of got his hand caught in the cookie jar, and now it keeps changing what's on its website to now try to come up with some sort of- now it's arguing that it's making generic use of Visa, that it's offering information on travel Visas, which they never did before, which they're still not doing or did not do until more than three years after they adopted the domain name, more than a year after the litigation started. They always had all this material about languages and so on, right? Sure, languages, tutorials, web design, web programming, but they had no- None of which has anything to do with what Visa International does. Visa International does more than credit cards. It has financial services. It has business information. It doesn't have websites. It doesn't do translations. It doesn't teach people languages. No, it does not do that. It does have a travel site called Visa Destinations. So there's no evidence, as JSL is claiming today, that they were making generic use of Visa in connection with travel Visa services. The only thing they point to, the only thing they point to in the record that supports their contention at all or is relevant to their contention that they were using Visa in a generic sense is a page on a website where I had done a search on their directory page of the word Visa, and it returns several different websites with information on Visas. I actually did the site on their site, printed that out, and attached it as an exhibit. That does not mean that they have any information on their website regarding Visas. As they describe their directory service, it goes out to the web and brings in information when someone conducts a search term. Their argument is like saying that Google is in the business of everything because you can search for anything on Google. But there's really no evidence that they ever used Visa in a generic sense. Their understanding of the generic maybe was in a more metaphorical sense, but it wasn't your metaphorical sense, and they were using it in the sense of Visa to the world because you're learning languages. I think that's a suggestive use. Okay. But it's a different suggestion. Yes. But anyway, isn't the hard question here, aside from all this, the issue of whether you need to remand under Moseley because the findings, either the findings nor the expert testimony relate to the standard as it's now been articulated, whatever it is. Sure. And, Your Honor, in the district court, we clearly argued to the district court that the appropriate standard at the time was likelihood of dilution. But in a couple of different places in the district court's opinion, it did say that established facts indicate that JSL has diluted or is likely to dilute the Visa mark. Well, that's in the disjunctive, so it doesn't prove anything. I'm sorry? Since it's in the disjunctive, he therefore didn't find that it has diluted. He never made that finding. Correct. It wasn't a required finding, but he didn't have to say that it has diluted. And if we – so then we have two choices. We can look at the current record in light of that standard, but that wouldn't be fair to you, because you didn't have a chance to make a record under the actual standard. So isn't the obvious answer here, and indeed what we did in the only case that I know of, the Horfak case, just to remand? Well, that certainly is an option, and if you're going to rule against me, then I'm making the standard that I would like that. How can we rule for you? On this record. As things now stand, I mean, the expert definitely did not make the finding that that's necessary under Mosley. The District Court wasn't looking at it with that standard, and you weren't putting in a record looking at that standard. But I do think that there's sufficient evidence in the record to find that there is actual dilution. What would that be? What is that evidence? For three reasons. One is I'd first like to discuss what Mosley means to the extent we can understand it. The Supreme Court seemed to create a dichotomy between cases in which the marks at issue are identical and cases in which the marks at issue are not identical. And the Court held that at least where the marks at issue are not identical, the trademark owner must prove more than a mental association between the junior user's mark and the famous mark. Now, the Court seemed to suggest, or at least leave open the possibility, that where the marks at issue are identical, then something less can be required. But these are not identical. There's been several courts that have held that marks that differ by only the letter, generic letter E, are identical. There's an oddity about that. That could be true if the phrase then wouldn't sound like a phrase. I mean, if you said E-Nike, it's hard to see how that's anything but Nike. But actually, if I looked at the word Avisa, I just think it's a word, Avisa. I wouldn't even think that it was E-Visa. Well, they emphasize the difference between the E and the Visa on their website. Well, that's when you get to the website. But there might be a distinction between the two, for example. And you're really not concerned about the website. No one's going to come to that website and think it's Visa. You're really concerned about the domain name. Actually, I'm not all that concerned about the domain name. I'm concerned about the deleting use, having any mark out there that includes Visa mark used as a mark in commerce. There's certainly plenty of third-party use of the word Visa in its generic sense. There's probably hundreds or thousands of websites that contain the word Visa and domain names that use Visa in a generic sense. But how many uses of Visa as a trademark can you think of? We know of credit cards, financial services. They've not proffered any evidence that there's any third-party use of the word Visa as a trademark. Now they are using Visa as a trademark with just the letter E added as a prefix. And the letter E is a generic, trite, insignificant term, meaning electronic. And we've proffered evidence that from other courts holding that E is generic, that it doesn't serve any source-identifying function, and that when people see the letter E, they ascribe no source-identifying substance to it. You were going to tell us about the evidence of actual dilution. So far you've told us what we should not be looking for. Right, and I'm getting to the issue of what the standard is versus when you have marks that are not identical versus identical. If you have identical marks, then I think something less than showing actual dilution or allowing you to presume actual dilution is enough based on the identity of the marks. All Justice Stevens says is that's just maybe circumstantial evidence. Right, and I'm not really sure what that sentence means. Does that mean that you can't use circumstantial evidence to prove dilution when the marks are not identical? I think it would be unlikely for any court to hold that you couldn't use circumstantial evidence to prove your case. So I'm not sure what that is. Well, I'm not sure. Well, assuming the marks were identical and he says it may be circumstantial evidence, my only question is, is that enough? I think it's enough. The reason I think it's enough is for a couple of different reasons. One is in the legislative history where they talked about DuPont's shoes, Buick aspirin, and Kodak pianos, they gave those examples of what would be actionable under the Act. They didn't say that would be actionable under the Act if consumers associated the two marks and there was proof of actual dilution. It was a blanket statement that those uses would be actionable. Secondly, where you have two identical marks in use, I think actual dilution is a certainty. If you see the word Kodak used on a convenience store, do you need to prove association when the marks are identical? Doesn't Thayne, not to belabor that, sort of answer this, too, because it basically, looking at it for a different reason, says that incorporating the word Shrek into a larger word you could think was identical and you could think was not identical, therefore, can't be decided on summary judgment. Is that the answer here, too? I think Thayne is where there's that much of a difference, Orba, Shrek versus Shrek. But it had the capitalized same word in the middle. That's basically what you're saying here, that they had E and then V with a capital V. Except Orba, I would not argue, is generic. E is a commonly used generic term on the Internet for all sorts of services, e-commerce, e-mail. E-pay. And we're to disregard. Exactly. Exactly. And other courts have held that marks, when you're comparing marks that have the E prefix versus those that don't, that they're either identical or virtually identical, because it doesn't serve any source identifying function. Virtually identical isn't identical. And I looked up the word identical, and some dictionaries define it to mean exactly the same. Some define it to mean exactly the same or essentially the same, but not literally the same. So with respect to the evidence that we're relying on, there's basically three different aspects. One is there is the unrebutted testimony of Alexander Simonson. That's what? I'm sorry? The unrebutted evidence of expert witness Alexander Simonson. I'm sorry, Itamar Simonson. It wasn't as to actual evidence, as to actual dilution. There was a section of his report where he discussed both the mental association and there was a separate section on the effect of that, the impact of the mental association, where he concluded that there was, that there will be dilution. I know GSL has argued that that's not in the report, but it is. Would you have his declaration handy? Sure. Supplemental excerpts of the record. Just his declaration. I mean, I don't. I have his declaration. Oh, you have his declaration? I was looking at his expert report. Maybe it's the same thing. What's the number? Supplemental excerpts of the record. Yes. His expert report of Dr. Itamar Simonson. Right. Supplemental excerpts 122. 122. Paragraph. Paragraph 33 says the analysis of dilution involves two basic questions. And the first one is the association between the two marks. And then, on the last two lines of that page, he says, then we need to examine the impact of such a mental association on the visa mark, its uniqueness, distinctiveness. Then he goes on, on page SER 126, 127, 128. That's his analysis of the actual dilution. At that point, he's already concluded that there's a mental association. Right. He's discussing. Right. He says this mental, this analysis of mental association, back on paragraph 38. Right. So beginning in paragraph 39. Right. Through 43, he's discussing the impact of the mental association. He says this similarity of the marks further enhances the likelihood that consumers will associate the two and, consequently, that the E-Visa mark will dilute the visa mark. Which paragraph is that here? 38. In 40, he says, consistent with the above analysis, since E-Visa is likely to bring visa to mind, exposure of consumers to the E-Visa mark will blur the meaning and associations of the visa mark. And then he explains how that will happen over time. I mean, dilution is a gradual process. And the fact that he's speaking in future tense doesn't mean he's saying likely. He's saying this will happen over time. But the next sentence is, as this process progresses, consumer acceptance might be negatively affected. The effectiveness will diminish. It's all very murky. And, Your Honor, that evidence is. I have a larger problem with this. What's expert about what he said? Well. I mean, why couldn't you and I say the same exact thing? I wish he were here to answer that. I'm sorry. He did everything he could to opine short of doing a survey, which he. Well, but that's what you hire experts for. I mean, this is just anybody could say what he said. Well, except he goes through the value of brand distinctiveness and uniqueness. The principles he applies are on page 123 and 124, which explains the brand principles that he's relying on. I mean, I do think there's a common sense element to what he's opining about. I don't think it's because we're all consumers. I think we understand very easily what he's talking about. And that's why I think it makes perfect sense. And I don't think the next step would be to do a survey. And a survey would have to be done. All right. And I'm doubtless here. You have to have something that there's some kind of value added from the expert about knowledge, based on knowledge that the general world doesn't have. And this doesn't seem to me to meet it. It seems to me to be usurping a jury function, essentially. Well, they did file a motion in limine to exclude this report below. The court denied it as moot after granting summary judgment. But then they included it. But now you're relying on it as the problem. So if you're going to rely on it as the be-all and end-all of why you survive, if it's not going to meet an expert evidence standard, then how do we use it? Well, they relied on it in their brief. They submitted it as excerpts and cited to it in their opening brief. Okay. Well, maybe nobody should be relying on it. Well, I mean, I think they opened the door. I think it's going to be hard for them to say we can't rely on it after they cited it in their opening brief. They cited it just to demonstrate that it didn't do anything. They cited it for some of the substance as well. They cited it for the substance. Now, what's the third piece of evidence? We have the identical nature of the Simonson Declaration. What else? All right. Secondly is the identity of the marks at issue. In addition to the fact that the E is a generic term, we also have their use of Visa on their website in a nearly identical font, which they have failed to explain why they chose to use Visa in an identical font. Initially, when Visa was on their website, it was preceded by some Chinese characters, but any American consumer, English-speaking consumer, would view that as use of the Visa mark. They use Visa in the same color. The Visa uses its Visa mark. And they emphasize the Visa part of the mark by using the E in a different color. But not anymore. Well, right now their website is not up. At the time it was enjoined. At the time it was enjoined, I believe that they did use it in different colors. I said they didn't. I don't know. And, Your Honor, Visa has a family of 44 federally registered marks, not just the word Visa, but Visa Bucks, Visa Destinations, Visa Net, Visa Web. There's a listing in the excerpts of record of all the different marks. So they have a family of Visa marks. And the E Visa mark is treading on their family of marks because it includes the surname and there's only one letter off the surname. In the entire world of potential trademarks to select, they select the world-famous Visa mark. It's ranked 14th in the world in terms of fame. And they selected a generic letter E to precede it. It's funny, when I hear, like Judge Pizano, when I hear the word Visa, I hate to disappoint you, but Visa card does not come to my mind. Well, I think it depends on the context. If you're going through immigration and someone says, let me see your Visa card, you would pull out your, not your credit card, I assume you'd pull out your Visa. Or if you're talking about traveling overseas and needing to get a Visa, in the context you probably think of actual Visa. Okay, but you had a third, you're simply now going over the first set of evidence, i.e. identical nature. What's the third one? And then the third is the issue regarding the unique context of the Internet. And that is following on Panavision. Contrary to what JSL says, this is a cyber-squatting case. We do have a cyber-squatting claim. And there is evidence in the record that defendant JSL has registered other domain names that contain the trademarks of others. Is that the basis for the district court's injunction? No. The basis for the injunction was dilution. The court held that there were issues of fact regarding, I believe, the bad faith element of cyber-squatting. But the district court opinion did refer to these other domain names that Mr. Orr had registered. Where is that in the record, by the way? That was in the district court. I think it says the other domain names. I didn't find them. There were some records of other domain names, but they don't seem to be trademarks. On page, excerpts of record 160, it indicates that JSL registered usadirect-online.com, which contains AT&T's USA Direct trademark. JSL also registered the domain name picturebookmaker.com that contains Sony's picturebook mark. And then they registered jserve.com, which according to JSL's deposition was supposed to call to mind the CompuServe mark. So those are two examples where they registered marks containing federally registered trademarks of prominent companies and one where they admitted to trying to call to mind another mark, which CompuServe at the time was a federally registered mark. Damage as well as an injunction or just an injunction? I'm sorry? Are you seeking damages as well as an injunction or just an injunction? We do have claims for damages through the cyber-squatting claim and through trademark infringement. Dilution, you can only get an injunction. That's correct. As far as dilution, only an injunction. I thought you can get damages for willfulness and for willful. For willfulness for dilution, but we're not claiming willfulness for the dilution claim. So just a little more about the unique context of the Internet. How does that feed in? This is going back to Panavision. The rationale for having basically a lower standard of proof for dilution on the Internet is because registration of a domain name precludes a famous trademark owner from using that domain name. Now, JSL argues that they haven't precluded us from using visa.com, and that's true. Or e-visa, which you do use. Correct, but what they have precluded us from doing is using a number of different, well, in this case the e-visa.com mark as a domain name on the Internet. And JSL's argument that Panavision only applies to trademark.com domain names does not appreciate the fact that companies usually have multiple websites, and visa does. For example, they have visa destinations for travel sites, visa bucks for a special site for teenagers. They have multiple different sites. And when you're looking for the website of a company, you may not necessarily go to trademark.com. You may not necessarily go to Toyota.com if you're looking for parts. But here, doesn't the fact that you're not Panavision, you're visa, and visa is a generic word. So there have to be, and you agree that there are, all kinds of domain names running around the Internet that use the word visa. That's correct. But they're not using visa generically. They're not? I mean, here they're not. Yes, but it seems to me that that vastly weakens the special Internet argument because there are domain names that you're not going to be able to use because other people legitimately have them. Right, but we don't care about the generic uses. For example, if someone has a domain name visasandpassports.com, we're not going to use visasandpassports.com because But you use visa destinations, right, or visa travel. Suppose somebody wants to use a trademark that says using visa in its generic language meaning with the word travel. They're probably going to be able to do it. I'm saying it's different than Panavision. Nobody's going to just come up with Panavision by itself. That's true. There is a distinction there where there's a coin term versus not. But here, again, we're talking about the famous mark plus a generic letter E. And we've shown, I think in the record, there's I'm making a more discrete point. You said that Visa wants to use various domain names. Because it's a generic word, they're not going to be able to just choose whatever domain name they want because they simply are not going to have a monopoly on the word visa as a domain name, unlike Panavision. It's just not going to happen. So doesn't that back out what's special about the Internet here? I don't think it does because to allow JSL to use eVisa.com, they're still using it as a trademark. Well, that may be, and your other points may work, but this one I'm saying, which depends on really wanting to have a monopoly in domain names on the word visa, you're just not going to have. We just want a monopoly on domain names that contain visa as used as a trademark, not all domain names that contain the word visa. I think they have a strange interest as to a domain name because domain names are not. . . Inherently generic or not. Yes, until you know it's there. Right. No problem. Well, so then you still wouldn't have the use of the domain name. That's my point. That's true. Right. That's true. But, right, I guess it might be differing on what point I'm trying to make. And we wouldn't have a problem with that. But we do have a problem with them using it as a trigger. Your problem isn't the domain name. That's my point. No, our problem is not inherently the domain name. JSL registered this in 97. We didn't even take action in this matter until, I think, 2000 because they weren't using it. We didn't know how they were going to use it. We kept watching to see how they were going to use it. And when they started using it as a trademark and then filed federal trademark applications to register e-visa and then opposed our trademark applications for e-visa, e-visa and e-visa, then we took action because it was clear at that point that they were trying to gain trademark rights and a famous mark plus the letter E. Okay. Thank you, counsel. Thank you. Give me extra time. Sir, I realize I have about three minutes, so I will proceed. Yes. I know there's one other matter on the calendar. As part of the colloquy with opposing counsel, what was said was that the meaning of visa depends on the context. Frankly, that's the whole point. The district court paid no attention to the context in which the word visa might be understood or the way the word e-visa used as a trademark might be understood. Part of the reason for that was because he was applying the incorrect, what came to be the incorrect standard because of Mosley. I also ---- What did the letter E-visa logo look like on the website at the time it was enjoined? There were different colors involved. It was all lowercase, E in red. He said it was no lowercase. Is that just a dispute? About whether it was all lowercase? My understanding is that he said it was still E, capital visa, even when ---- Not at the time of the injunction, no, Your Honor. I believe that is in the record, although I don't think I can point you straight to it. But the E had a different color. The E had a different color. That's correct, Your Honor. The E had a different color. The other point I want to return to is some of Judge Bea's question about the presence of actual confusion, because I'm not sure I handled that question that well. In a trademark infringement context, the presence of evidence of actual confusion is a factor. It is not necessarily a determinative factor. It is a factor. Similarly, in a trademark dilution context, it can certainly be a factor, along with some of the other things that would amount to circumstantial evidence of actual dilution, intent, identity of the words, things of that nature. That being said, we respectfully urge this Court to reverse, remand to the district court, and hopefully with some guidance regarding how to apply the Trademark Dilution Act in the context of ---- Well, I mean, the Supreme Court. Davis-Mosley. Yes. All right. Perhaps someday we'll do better, but I don't know. Thank you, Your Honor. All right. Our last case on today's calendar is Gemory v. Apario.
judges: Paez, Berzon, Bea